Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ABRAMSKI *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 12–1493.   Argued January 22, 2014—Decided June 16, 2014

Petitioner Bruce Abramski offered to purchase a handgun for his uncle. The form that federal regulations required Abramski to fill out (Form 4473) asked whether he was the "actual transferee/buyer" of the gun, and clearly warned that a straw purchaser (namely, someone buying a gun on behalf of another) was not the actual buyer. Abramski falsely answered that he was the actual buyer. Abramski was convicted for knowingly making false statements "with respect to any fact material to the lawfulness of the sale" of a gun, 18 U. S. C. §922(a)(6), and for making a false statement "with respect to the information required . . . to be kept" in the gun dealer's records, §924(a)(1)(A). The Fourth Circuit affirmed.

*Held:*

 1. Abramski's misrepresentation is material under §922(a)(6). Pp. 7–22.

 (a) Abramski contends that federal gun laws are entirely unconcerned with straw arrangements: So long as the person at the counter is eligible to own a gun, the sale to him is legal under the statute. To be sure, federal law regulates licensed dealer's transactions with "persons" or "transferees" without specifying whether that language refers to the straw buyer or the actual purchaser. But when read in light of the statute's context, structure, and purpose, it is clear this language refers to the true buyer rather than the straw. Federal gun law establishes an elaborate system of in-person identification and background checks to ensure that guns are kept out of the hands of felons and other prohibited purchasers. §§922(c), 922(t). It also imposes record-keeping requirements to assist law enforcement authorities in investigating serious crimes through the tracing of guns to their buyers. §922(b)(5), 923(g). These provisions would mean little

if a would-be gun buyer could evade them all simply by enlisting the aid of an intermediary to execute the paperwork on his behalf. The statute's language is thus best read in context to refer to the actual rather than nominal buyer. This conclusion is reinforced by this Court's standard practice of focusing on practical realities rather than legal formalities when identifying the parties to a transaction. Pp. 7–19.

(b) Abramski argues more narrowly that his false response was not material because his uncle could have legally bought a gun for himself. But Abramski's false statement prevented the dealer from insisting that the true buyer (Alvarez) appear in person, provide identifying information, show a photo ID, and submit to a background check. §§922(b), (c), (t). Nothing in the statute suggests that these legal duties may be wiped away merely because the actual buyer turns out to be legally eligible to own a gun. Because the dealer could not have lawfully sold the gun had it known that Abramski was not the true buyer, the misstatement was material to the lawfulness of the sale. Pp. 19–22.

2. Abramski's misrepresentation about the identity of the actual buyer concerned "information required by [Chapter 44 of Title 18 of the United States Code] to be kept" in the dealer's records. §924(a)(1)(A). Chapter 44 contains a provision requiring a dealer to "maintain such records . . . as the Attorney General may . . . prescribe." §923(g)(1)(A). The Attorney General requires every licensed dealer to retain in its records a completed copy of Form 4473, see 27 CFR §478.124(b), and that form in turn includes the "actual buyer" question that Abramski answered falsely. Therefore, falsely answering a question on Form 4473 violates §924(a)(1)(A). Pp. 22–23.

706 F. 3d 307, affirmed.

KAGAN, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. SCALIA, J., filed a dissenting opinion, in which ROBERTS, C. J., and THOMAS and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–1493

_____

## BRUCE JAMES ABRAMSKI, JR., PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 16, 2014]

JUSTICE KAGAN delivered the opinion of the Court.

Before a federally licensed firearms dealer may sell a
gun, the would-be purchaser must provide certain per-
sonal information, show photo identification, and pass a
background check. To ensure the accuracy of those sub-
missions, a federal statute imposes criminal penalties on
any person who, in connection with a firearm's acquisition,
makes false statements about "any fact material to the
lawfulness of the sale." 18 U. S. C. §922(a)(6). In this
case, we consider how that law applies to a so-called straw
purchaser—namely, a person who buys a gun on someone
else's behalf while falsely claiming that it is for himself.
We hold that such a misrepresentation is punishable
under the statute, whether or not the true buyer could
have purchased the gun without the straw.

## I

### A

Federal law has for over 40 years regulated sales by
licensed firearms dealers, principally to prevent guns from
falling into the wrong hands. See Gun Control Act of
1968, 18 U. S. C. §921 *et seq.* Under §922(g), certain classes

of people—felons, drug addicts, and the mentally ill, to list a few—may not purchase or possess any firearm. And to ensure they do not, §922(d) forbids a licensed dealer from selling a gun to anyone it knows, or has reasonable cause to believe, is such a prohibited buyer. See *Huddleston* v. *United States*, 415 U. S. 814, 825 (1974) ("[T]he focus of the federal scheme," in controlling access to weapons, "is the federally licensed firearms dealer").

The statute establishes a detailed scheme to enable the dealer to verify, at the point of sale, whether a potential buyer may lawfully own a gun. Section 922(c) brings the would-be purchaser onto the dealer's "business premises" by prohibiting, except in limited circumstances, the sale of a firearm "to a person who does not appear in person" at that location. Other provisions then require the dealer to check and make use of certain identifying information received from the buyer. Before completing any sale, the dealer must "verif[y] the identity of the transferee by examining a valid identification document" bearing a photograph. §922(t)(1)(C). In addition, the dealer must procure the buyer's "name, age, and place of residence." §922(b)(5). And finally, the dealer must (with limited exceptions not at issue here[1]) submit that information to the National Instant Background Check System (NICS) to determine whether the potential purchaser is for any reason disqualified from owning a firearm. See §§922(t)(1)(A)–(B).

The statute further insists that the dealer keep certain records, to enable federal authorities both to enforce the law's verification measures and to trace firearms used in crimes. See H. R. Rep. No. 1577, 90th Cong., 2d Sess., 14

---

[1] The principal exception is for any buyer who has a state permit that has been "issued only after an authorized government official has verified" the buyer's eligibility to own a gun under both federal and state law. §922(t)(3).

(1968). A dealer must maintain the identifying information mentioned above (*i.e.,* name, age, and residence) in its permanent files. See §922(b)(5). In addition, the dealer must keep "such records of . . . sale[ ] or other disposition of firearms . . . as the Attorney General may by regulations prescribe." §923(g)(1)(A). And the Attorney General (or his designee) may obtain and inspect any of those records, "in the course of a bona fide criminal investigation," to "determin[e] the disposition of 1 or more firearms." §923(g)(7).

To implement all those statutory requirements, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) developed Form 4473 for gun sales. See Supp. App. 1–6. The part of that form to be completed by the buyer requests his name, birth date, and address, as well as certain other identifying information (for example, his height, weight, and race). The form further lists all the factors disqualifying a person from gun ownership, and asks the would-be buyer whether any of them apply (*e.g.,* "[h]ave you ever been convicted . . . of a felony?"). *Id., at* 1. Most important here, Question 11.a. asks (with bolded emphasis appearing on the form itself):

> "Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you.**" *Ibid.*

The accompanying instructions for that question provide:

> "**Question 11.a. Actual Transferee/Buyer:** For purposes of this form, you are the actual transferee/buyer if you are purchasing the firearm for yourself or otherwise acquiring the firearm for yourself . . . . You are also the actual transferee/buyer if you are legitimately purchasing the firearm as a gift for a third

party.   **ACTUAL TRANSFEREE/BUYER EXAM-
PLES:**  Mr. Smith asks Mr. Jones to purchase a fire-
arm for Mr. Smith.   Mr. Smith gives Mr. Jones the
money for the firearm.   Mr. Jones is **NOT THE
ACTUAL TRANSFEREE/BUYER** of the firearm
and must answer **"NO"** to question 11.a." *Id.*, at 4.

After responding to this and other questions, the customer
must sign a certification declaring his answers "true,
correct and complete." *Id.*, at 2.  That certification pro-
vides that the signator "understand[s] that making any
false . . . statement" respecting the transaction—and,
particularly, "answering 'yes' to question 11.a. if [he is] not
the actual buyer"—is a crime "punishable as a felony
under Federal law." *Ibid.* (bold typeface deleted).

  Two statutory provisions, each designed to ensure that
the dealer can rely on the truthfulness of the buyer's dis-
closures in carrying out its obligations, criminalize certain
false statements about firearms transactions.  First and
foremost, §922(a)(6), provides as follows:

> "It shall be unlawful . . . for any person in connection
> with the acquisition or attempted acquisition of any
> firearm or ammunition from [a licensed dealer] know-
> ingly to make any false or fictitious oral or written
> statement . . . , intended or likely to deceive such
> [dealer] with respect to any fact material to the law-
> fulness of the sale or other disposition of such firearm
> or ammunition under the provisions of this chapter."

That provision helps make certain that a dealer will re-
ceive truthful information as to any matter relevant to a
gun sale's legality.  In addition, §924(a)(1)(A) prohibits
"knowingly mak[ing] any false statement or representa-
tion with respect to the information required by this chap-
ter to be kept in the records" of a federally licensed gun
dealer.  The question in this case is whether, as the ATF
declares in Form 4473's certification, those statutory

provisions criminalize a false answer to Question 11.a.—
that is, a customer's statement that he is the "actual
transferee/buyer," purchasing a firearm for himself, when
in fact he is a straw purchaser, buying the gun on someone
else's behalf.

## B

The petitioner here is Bruce Abramski, a former police
officer who offered to buy a Glock 19 handgun for his
uncle, Angel Alvarez. (Abramski thought he could get the
gun for a discount by showing his old police identification,
though the Government contends that because he had
been fired from his job two years earlier, he was no longer
authorized to use that card.) Accepting his nephew's offer,
Alvarez sent Abramski a check for $400 with "Glock 19
handgun" written on the memo line. Two days later,
Abramski went to Town Police Supply, a federally licensed
firearms dealer, to make the purchase. There, he filled
out Form 4473, falsely checking "Yes" in reply to Question
11.a.—that is, asserting he was the "actual transferee/
buyer" when, according to the form's clear definition, he
was not. He also signed the requisite certification, ac-
knowledging his understanding that a false answer to
Question 11.a. is a federal crime. After Abramski's name
cleared the NICS background check, the dealer sold him
the Glock. Abramski then deposited the $400 check in his
bank account, transferred the gun to Alvarez, and got back
a receipt. Federal agents found that receipt while execut-
ing a search warrant at Abramski's home after he became
a suspect in a different crime.

A grand jury indicted Abramski for violating §§922(a)(6)
and 924(a)(1)(A) by falsely affirming in his response to
Question 11.a. that he was the Glock's actual buyer.
Abramski moved to dismiss both charges. He argued that
his misrepresentation on Question 11.a. was not "material
to the lawfulness of the sale" under §922(a)(6) because

Alvarez was legally eligible to own a gun. And he claimed that the false statement did not violate §924(a)(1)(A) because a buyer's response to Question 11.a. is not "required . . . to be kept in the records" of a gun dealer. After the District Court denied those motions, see 778 F. Supp. 2d 678 (WD Va. 2011), Abramski entered a conditional guilty plea, reserving his right to challenge the rulings. The District Court then sentenced him to five years of probation on each count, running concurrently.

The Court of Appeals for the Fourth Circuit affirmed the convictions. 706 F. 3d 307 (2013). It noted a division among appellate courts on the question Abramski raised about §922(a)(6)'s materiality requirement: Of three courts to have addressed the issue, one agreed with Abramski that a misrepresentation on Question 11.a. is immaterial if "the true purchaser [here, Alvarez] can lawfully purchase a firearm directly." *Id.*, at 315 (quoting *United States* v. *Polk*, 118 F. 3d 286, 295 (CA5 1997)).[2] The Fourth Circuit, however, thought the majority position correct: "[T]he identity of the actual purchaser of a firearm is a constant that is always material to the lawfulness of a firearm acquisition under §922(a)(6)." 706 F. 3d, at 316. The court also held that Abramski's conviction under §924(a)(1)(A) was valid, finding that the statute required a dealer to maintain the information at issue in its records. *Id.*, at 317.

We granted certiorari, 571 U. S. ___ (2013), principally to resolve the Circuit split about §922(a)(6). In this Court, Abramski renews his claim that a false answer to Question 11.a. is immaterial if the true buyer is legally eligible to purchase a firearm. But Abramski now focuses on a

————————

[2] Compare *Polk*, 118 F. 3d, at 294–295, with *United States* v. *Morales*, 687 F. 3d 697, 700–701 (CA6 2012) (a misrepresentation about the true purchaser's identity is material even when he can legally own a gun); *United States* v. *Frazier*, 605 F. 3d 1271, 1279–1280 (CA11 2010) (same).

new and more ambitious argument, which he concedes no
court has previously accepted. See Brief for Petitioner i.[3]
In brief, he alleges that a false response to Question 11.a.
is *never* material to a gun sale's legality, whether or not
the actual buyer is eligible to own a gun. We begin with
that fundamental question, next turn to what has become
Abramski's back-up argument under §922(a)(6), and fi-
nally consider the relatively easy question pertaining to
§924(A)(1)(a)'s separate false-statement prohibition. On
each score, we affirm Abramski's conviction.

## II

Abramski's broad theory (mostly echoed by the dissent)
is that federal gun law simply does not care about ar-
rangements involving straw purchasers: So long as the
person at the counter is eligible to own a gun, the sale to
him is legal under the statute. That is true, Abramski
contends, irrespective of any agreement that person has
made to purchase the firearm on behalf of someone else—
including someone who cannot lawfully buy or own a gun
himself. Accordingly, Abramski concludes, his "false
statement that he was the [Glock 19's] 'actual buyer,'" as
that term was "defined in Question 11.a., was not material"
—indeed, was utterly irrelevant—"to the lawfulness of
the sale." *Id.*, at 31 (emphasis deleted); see also *post,* at 4
(opinion of SCALIA, J.). In essence, he claims, Town Police
Supply could legally have sold the gun to him even if had
truthfully answered Question 11.a. by disclosing that he
was a straw—because, again, all the federal firearms law
cares about is whether the individual standing at the

_____

[3]Reflecting that prior consensus, neither of Abramski's principal
*amici*—the National Rifle Association and a group of 26 States—joins
Abramski in making this broader argument. They confine themselves
to supporting the more limited claim about straw purchases made on
behalf of eligible gun owners, addressed *infra*, at 19–22.

dealer's counter meets the requirements to buy a gun.[4]

At its core, that argument relies on one true fact: Federal gun law regulates licensed dealers' transactions with "persons" or "transferees," without specifically referencing straw purchasers. Section 922(d), for example, bars a dealer from "sell[ing] or otherwise dispos[ing] of" a firearm to any "person" who falls within a prohibited category—felons, drug addicts, the mentally ill, and so forth. See *supra*, at 1–2; see also §922(b)(5) (before selling a gun to a "person," the dealer must take down his name, age, and residence); §922(t)(1) (before selling a gun to a "person," the dealer must run a background check). Similarly, §922(t)(1)(C) requires the dealer to verify the identity of the "transferee" by checking a valid photo ID. See *supra,* at 2; see also §922(c) (spelling out circumstances in which a "transferee" may buy a gun without appearing at the dealer's premises). Abramski contends that Congress's use of such language alone, *sans* any mention of "straw purchasers" or "actual buyers," shows that "[i]t is not illegal to buy a gun for someone else." Brief for Petitioner 15–16; Reply Brief 1; see also *post,* at 2–6.

───────────

[4]The dissent reserves the question whether the false statement would be material if the straw purchaser knew that the true buyer was not eligible to own a firearm. *Post,* at 6, n. 2. But first, that reservation is of quite limited scope: Unlike Abramski's back-up argument, which imposes liability whenever the true purchaser cannot legally buy a gun, the dissent's reservation applies only when the straw has knowledge of (or at least reasonable cause to believe) that fact. And as we will later note, straws often do not have such knowledge. See *infra*, at 12–13. Second, the reservation (fairly enough for a reservation) rests on an uncertain legal theory. According to the dissent, a straw buyer might violate §922(a)(6) if a dealer's sale to him aids and abets his violation of §922(d)—a provision barring knowingly transferring a gun to an ineligible person, see *infra*, at 8, 17–18. But that reasoning presupposes that a firearms dealer acting in the ordinary course of business can ever have the intent needed to aid and abet a crime—a question this Court reserved not six months ago. See *Rosemond* v. *United States*, 572 U. S. ___ (2014) (slip op., at 12, n. 8).

But that language merely raises, rather than answers, the critical question: In a straw purchase, who *is* the "person" or "transferee" whom federal gun law addresses? Is that "person" the middleman buying a firearm on someone else's behalf (often because the ultimate recipient could not buy it himself, or wants to camouflage the transaction)? Or is that "person" instead the individual really paying for the gun and meant to take possession of it upon completion of the purchase? Is it the conduit at the counter, or the gun's intended owner?[5] In answering that inquiry, we must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context, "structure, history, and purpose." *Maracich* v. *Spears*, 570 U. S. ___, ___ (2013) (slip op., at 26). All those tools of divining meaning—not to mention common sense, which is a fortunate (though not inevitable) side-benefit of construing statutory terms fairly—demonstrate that §922, in regulating licensed dealers' gun sales, looks through the straw to the actual buyer.[6]

---

[5] The dissent claims the answer is easy because "if I give my son $10 and tell him to pick up milk and eggs at the store, no English speaker would say that the store 'sells' the milk and eggs to me." *Post*, at 4. But try a question more similar to the one the gun law's text raises: If I send my brother to the Apple Store with money and instructions to purchase an iPhone, and then take immediate and sole possession of that device, am I the "person" (or "transferee") who has bought the phone or is he? Nothing in ordinary English usage compels an answer either way.

[6] Contrary to the dissent's view, our analysis does not rest on mere "purpose-based arguments." *Post*. at 7. We simply recognize that a court should not interpret each word in a statute with blinders on, refusing to look at the word's function within the broader statutory context. As we have previously put the point, a "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.*, 484 U. S. 365, 371 (1988).

The overarching reason is that Abramski's reading would undermine—indeed, for all important purposes, would virtually repeal—the gun law's core provisions.[7]  As noted earlier, the statute establishes an elaborate system to verify a would-be gun purchaser's identity and check on his background.  See *supra,* at 2.  It also requires that the information so gathered go into a dealer's permanent records.  See *supra,* at 2–3.  The twin goals of this comprehensive scheme are to keep guns out of the hands of criminals and others who should not have them, and to assist law enforcement authorities in investigating serious crimes.  See *Huddleston*, 415 U. S., at 824; *supra,* at 2–3.  And no part of that scheme would work if the statute turned a blind eye to straw purchases—if, in other words, the law addressed not the substance of a transaction, but only empty formalities.

To see why, consider what happens in a typical straw purchase.  A felon or other person who cannot buy or own a gun still wants to obtain one.  (Or, alternatively, a person who could legally buy a firearm wants to conceal his purchase, maybe so he can use the gun for criminal purposes without fear that police officers will later trace it to him.)  Accordingly, the prospective buyer enlists an intermediary to help him accomplish his illegal aim.  Perhaps he conscripts a loyal friend or family member; perhaps more often, he hires a stranger to purchase the gun for a price.  The actual purchaser might even accompany the straw to the gun shop, instruct him which firearm to buy, give him the money to pay at the counter, and take possession as they walk out the door.  See, *e.g., United States*

---

[7]That reading would also, at a stroke, declare unlawful a large part of what the ATF does to combat gun trafficking by criminals. See Dept. of Treasury, Bureau of Alcohol, Tobacco & Firearms, Following the Gun: Enforcing Federal Laws Against Firearms Traffickers, p. xi (June 2000) (noting that in several prior years "[a]lmost half of all [ATF firearm] trafficking investigations involved straw purchasers").

v. *Bowen*, 207 Fed. Appx. 727, 729 (CA7 2006) (describing a straw purchase along those lines); *United States* v. *Paye*, 129 Fed. Appx. 567, 570 (CA11 2005) (*per curiam*) (same). What the true buyer would *not* do—what he would leave to the straw, who possesses the gun for all of a minute—is give his identifying information to the dealer and submit himself to a background check. How many of the statute's provisions does that scenario—the lawful result of Abramski's (and the dissent's) reading of "transferee" and "person"—render meaningless?

Start with the parts of §922 enabling a dealer to verify whether a buyer is legally eligible to own a firearm. That task, as noted earlier, begins with identification—requesting the name, address, and age of the potential purchaser and checking his photo ID. See §§922(b)(5), (t)(1)(C); *supra,* at 2. And that identification in turn permits a background check: The dealer runs the purchaser's name through the NICS database to discover whether he is, for example, a felon, drug addict, or mentally ill person. See §§922(d), (t)(1); *supra,* at 2. All those provisions are designed to accomplish what this Court has previously termed Congress's "principal purpose" in enacting the statute—"to curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them.'" *Huddleston,* 415 U. S., at 824 (quoting S. Rep. No. 1501, 90th Cong., 2d Sess. 22 (1968)). But under Abramski's reading, the statutory terms would be utterly ineffectual, because the identification and background check would be of the wrong person. The provisions would evaluate the eligibility of mere conduits, while allowing every criminal (and drug addict and so forth) to escape that assessment and walk away with a weapon.

Similarly, Abramski's view would defeat the point of §922(c), which tightly restricts the sale of guns "to a person who does not appear in person at the licensee's business premises." See *supra,* at 2. Only a narrow class of

prospective buyers may ever purchase a gun from afar—
primarily, individuals who have already had their eligibil-
ity to own a firearm verified by state law enforcement
officials with access to the NICS database. See 27 CFR
§478.96(b) (2014), 18 U. S. C. §922(t)(3); n. 1, *supra.* And
even when an individual fits within that category, he still
must submit to the dealer a sworn statement that he can
lawfully own a gun, as well as provide the name and ad-
dress of the principal law enforcement officer in his com-
munity. See §922(c)(1). The dealer then has to forward
notice of the sale to that officer, in order to allow law
enforcement authorities to investigate the legality of the
sale and, if necessary, call a stop to it. See §§922(c)(2)–(3).
The provision thus prevents remote sales except to a small
class of buyers subject to extraordinary procedures—
again, to ensure effective verification of a potential pur-
chaser's eligibility. Yet on Abramski's view, a person
could easily bypass the scheme, purchasing a gun without
ever leaving his home by dispatching to a gun store a
hired deliveryman. Indeed, if Abramski were right, we see
no reason why anyone (and certainly anyone with less-
than-pure motives) would put himself through the proce-
dures laid out in §922(c): Deliverymen, after all, are not so
hard to come by.

And likewise, the statute's record-keeping provisions
would serve little purpose if the records kept were of
nominal rather than real buyers. As noted earlier, dealers
must store, and law enforcement officers may obtain,
information about a gun buyer's identity. See §§922(b)(5),
923(g); *supra,* at 3. That information helps to fight serious
crime. When police officers retrieve a gun at a crime
scene, they can trace it to the buyer and consider him as a
suspect. See *National Shooting Sports Foundation, Inc.* v.
*Jones,* 716 F. 3d 200, 204 (CADC 2013) (describing law
enforcement's use of firearm tracing). Too, the required
records enable dealers to identify certain suspicious pur-

chasing trends, which they then must report to federal authorities. See §923(g)(3) (imposing a reporting obligation when a person buys multiple handguns within five days). But once again, those provisions can serve their objective only if the records point to the person who took actual control of the gun(s). Otherwise, the police will at most learn the identity of an intermediary, who could not have been responsible for the gun's use and might know next to nothing about the actual buyer. See, *e.g., United States* v. *Juarez*, 626 F. 3d 246, 249 (CA5 2010) (straw purchaser bought military-style assault rifles, later found among Mexican gang members, for a buyer known "only as 'El Mano'"). Abramski's view would thus render the required records close to useless for aiding law enforcement: Putting true numbskulls to one side, anyone purchasing a gun for criminal purposes would avoid leaving a paper trail by the simple expedient of hiring a straw.

To sum up so far: All the prerequisites for buying a gun described above refer to a "person" or "transferee." Read Abramski's way ("the man at the counter"), those terms deny effect to the regulatory scheme, as criminals could always use straw purchasers to evade the law.[8] Read the other way ("the man getting, and always meant to get, the firearm"), those terms give effect to the statutory provi-

---

[8]The dissent is mistaken when it says that the ATF's own former view of the statute refutes this proposition. See *post,* at 11–12. As we will later discuss, see *infra,* at 21–22, the ATF for a time thought that §922(a)(6) did not cover cases in which the true purchaser could have legally purchased a gun himself. But Abramski's principal argument extends much further, to cases in which straws buy weapons for criminals, drug addicts, and other prohibited purchasers. For the reasons just stated, that interpretation would render the statute all but useless. And although the dissent appeals to a snippet of congressional testimony to suggest that ATF once briefly held that extreme view of the statute, it agrees that by at least 1979 (well over three decades ago), ATF recognized the unlawfulness of straw purchases on behalf of prohibited persons.

sions, allowing them to accomplish their manifest objects.
That alone provides more than sufficient reason to under-
stand "person" and "transferee" as referring not to the
fictitious but to the real buyer.

And other language in §922 confirms that construction,
by evincing Congress's concern with the practical realities,
rather than the legal niceties, of firearms transactions.
For example, §922(a)(6) itself bars material misrepresen-
tations "in connection with the *acquisition*," and not just
the purchase, of a firearm. That broader word, we have
previously held, does not focus on "legal title"—let alone
legal title for a few short moments, until another, always
intended transfer occurs. *Huddleston*, 415 U. S., at 820.
Instead, the term signifies "com[ing] into possession,
control, or power of disposal," as the actual buyer in a
straw purchase does. *Ibid*. Similarly, we have reasoned
that such a substance-over-form approach draws support
from the statute's repeated references to "the sale *or other
disposition*" of a firearm. §922(a)(6); see §922(d) (making
it unlawful to "sell *or otherwise dispose* of " a gun to a
prohibited person). That term, we have stated, "was
aimed at providing maximum coverage." *Id.*, at 826–827.
We think such expansive language inconsistent with
Abramski's view of the statute, which would stare myopi-
cally at the nominal buyer while remaining blind to the
person exiting the transaction with control of the gun.

Finally, our reading of §922 comports with courts'
standard practice, evident in many legal spheres and
presumably known to Congress, of ignoring artifice when
identifying the parties to a transaction. In *United States*
v. *One 1936 Model Ford V-8 Deluxe Coach, Commercial
Credit Co.*, 307 U. S. 219 (1939), for example, we consid-
ered the operation of a statute requiring forfeiture of any
interest in property that was used to violate prohibition
laws, except if acquired in good faith. There, a straw
purchaser had bought a car in his name but with his

brother's money, and transferred it to the brother—a known bootlegger—right after driving it off the lot. See *id.,* at 222–223. The Court held the finance company's lien on the car non-forfeitable because the company had no hint that the straw was a straw—that his brother would in fact be the owner. See *id.,* at 224. But had the company known, the Court made clear, a different result would have obtained: The company could not have relied on the formalities of the sale to the "'straw' purchaser" when it knew that the "real owner and purchaser" of the car was someone different. *Id.,* at 223–224. We have similarly emphasized the need in other contexts, involving both criminal and civil penalties, to look through a transaction's nominal parties to its true participants. See, *e.g., American Needle, Inc.* v. *National Football League*, 560 U. S. 183, 193 (2010) (focusing on "substance rather than form" in assessing when entities are distinct enough to be capable of conspiring to violate the antitrust laws); *Gregory* v. *Helvering,* 293 U. S. 465, 470 (1935) (disregarding an intermediary shell corporation created to avoid taxes because doing otherwise would "exalt artifice above reality"). We do no more than that here in holding, consistent with §922's text, structure, and purpose, that using a straw does not enable evasion of the firearms law.

Abramski, along with the dissent, objects that such action is no circumvention—that Congress made an intentional choice, born of "political compromise," to limit the gun law's compass to the person at the counter, even if merely acting on another's behalf. Reply Brief 11; *post,* at 10–11. As evidence, Abramski states that the statute does not regulate beyond the initial point of sale. Because the law mostly addresses sales made by licensed dealers, a purchaser can (within wide limits) subsequently decide to resell his gun to another private party. See Reply Brief 11. And similarly, Abramski says, a purchaser can buy a gun for someone else as a gift. See Brief for Petitioner 26–

27, n. 3. Abramski lumps in the same category the trans-
fer of a gun from a nominal to a real buyer—as something,
like a later resale or gift, meant to fall outside the stat-
ute's (purported) standing-in-front-of-the-gun-dealer
scope. See Reply Brief 13; see also *post,* at 7–9.

But Abramski and the dissent draw the wrong conclu-
sion from their observations about resales and gifts. Yes,
Congress decided to regulate dealers' sales, while leaving
the secondary market for guns largely untouched. As we
noted in *Huddleston*, Congress chose to make the dealer
the "principal agent of federal enforcement" in "restricting
[criminals'] access to firearms." 415 U. S., at 824. And
yes, that choice (like pretty much everything Congress
does) was surely a result of compromise. But no, straw
arrangements are not a part of the secondary market,
separate and apart from the dealer's sale. In claiming as
much, Abramski merely repeats his mistaken assumption
that the "person" who acquires a gun from a dealer in a
case like this one is the straw, rather than the individual
who has made a prior arrangement to pay for, take pos-
session of, own, and use that part of the dealer's stock.
For all the reasons we have already given, that is not a
plausible construction of a statute mandating that the
dealer identify and run a background check on the person
to whom it is (really, not fictitiously) selling a gun. See
*supra,* at 9–15. The individual who sends a straw to a gun
store to buy a firearm *is* transacting with the dealer, in
every way but the most formal; and that distinguishes
such a person from one who buys a gun, or receives a gun
as a gift, from a private party.[9] The line Congress drew

---

[9]The dissent responds: "That certainly distinguishes" the individual
transacting with a dealer through a straw from an individual receiving
a gun from a private party; "so would the fact that [the former] has
orange hair." *Post,* at 9. But that is an example of wit gone wrong.
Whether the purchaser has orange hair, we can all agree, is immaterial
to the statutory scheme. By contrast, whether the purchaser has

between those who acquire guns from dealers and those
who get them as gifts or on the secondary market, we
suspect, reflects a host of things, including administrative
simplicity and a view about where the most problematic
firearm transactions—like criminal organizations' bulk
gun purchases—typically occur. But whatever the reason,
the scarcity of controls in the secondary market provides
no reason to gut the robust measures Congress enacted at
the point of sale.

Abramski claims further support for his argument from
Congress's decision in 1986 to amend §922(d) to prohibit a
private party (and not just, as originally enacted, a li-
censed dealer) from selling a gun to someone he knows or
reasonably should know cannot legally possess one. See
Firearm Owners' Protection Act, §102(5)(A), 100 Stat.
451–452. According to Abramski, the revised §922(d)
should be understood as Congress's exclusive response to
the potential dangers arising from straw purchases. See
Brief for Petitioner 26–27. The amendment shows, he
claims, that "Congress chose to address this perceived
problem in a way other than" by imposing liability under
§922(a)(6) on a straw who tells a licensed dealer that he is
the firearm's actual buyer. Reply Brief 14, n. 2.

But Congress's amendment of §922(d) says nothing
about §922(a)(6)'s application to straw purchasers. In en-
acting that amendment, Congress left §922(a)(6) just as
it was, undercutting any suggestion that Congress some-

_____

transacted with a licensed dealer is integral to the statute—because, as
previously noted, "the federal scheme . . . controls access to weapons"
through the federally licensed firearms dealer, who is "the principal
agent of federal enforcement." *Huddleston* v. *United States*, 415 U. S.
814, 824, 825 (1974); see *supra,* at 16. In so designing the statute,
Congress chose not to pursue the goal of "controll[ing] access" to guns to
the nth degree; buyers can, as the dissent says, avoid the statute's
background check and record-keeping requirements by getting a gun
second-hand. But that possibility provides no justification for limiting
the statute's considered regulation of *dealer* sales.

how intended to contract that provision's reach. The amendment instead performed a different function: Rather than ensuring that a licensed dealer receives truthful information, it extended a minimal form of regulation to the *secondary* market. The revised §922(d) prevents a private person from knowingly selling a gun to an ineligible owner no matter when or how he acquired the weapon: It thus applies not just to a straw purchaser, but to an individual who bought a gun for himself and later decided to resell it. At the same time, §922(d) has nothing to say about a raft of cases §922(a)(6) covers, including all the (many) straw purchases in which the frontman does not know that the actual buyer is ineligible. See *supra,* at 13. Thus, §922(d) could not serve as an effective substitute for §922(a)(6). And the mere potential for some transactions to run afoul of both prohibitions gives no cause to read §922(d) as limiting §922(a)(6) (or vice versa). See, *e.g., United States* v. *Batchelder*, 442 U. S. 114, 118–126 (1979).[10]

Abramski's principal attack on his §922(a)(6) conviction therefore fails. Contrary to his contention, the information Question 11.a. requests—"[a]re you the actual transferee/buyer[?]" or, put conversely, "are [you] acquir-

--------------

[10]Nor do we agree with the dissent's argument (not urged by Abramski himself) that the rule of lenity defeats our construction. See *post,* at 12–14. That rule, as we have repeatedly emphasized, applies only if, "after considering text, structure, history and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Maracich* v. *Spears*, 570 U. S ___, ___ (2013) (slip op. at 26) (quoting *Barber* v. *Thomas*, 560 U.S. 474, 488 (2010)). We are not in that position here: Although the text creates some ambiguity, the context, structure, history, and purpose resolve it. The dissent would apply the rule of lenity here because the statute's text, taken alone, permits a narrower construction, but we have repeatedly emphasized that is not the appropriate test. See, *e.g., Muscarello* v. *United States*, 524 U. S. 125, 138 (1998); *Smith* v. *United States*, 508 U. S. 223, 239 (1993).

ing the firearm(s) on behalf of another person[?]"—is relevant to the lawfulness of a gun sale. That is because, for all the reasons we have given, the firearms law contemplates that the dealer will check not the fictitious purchaser's but instead the true purchaser's identity and eligibility for gun ownership. By concealing that Alvarez was the actual buyer, Abramski prevented the dealer from transacting with Alvarez face-to-face, see §922(c), recording his name, age, and residence, see §922(b)(5), inspecting his photo ID, see §922(t)(1)(C), submitting his identifying information to the background check system, see §922(t)(1)(B), and determining whether he was prohibited from receiving a firearm, see §922(d). In sum, Abramski thwarted application of essentially all of the firearms law's requirements. We can hardly think of a misrepresentation any more material to a sale's legality.

## III

Abramski also challenges his §922(a)(6) conviction on a narrower ground. For purposes of this argument, he assumes that the Government can make its case when a straw hides the name of an underlying purchaser who is legally ineligible to own a gun. But, Abramski reminds us, that is not true here, because Alvarez could have bought a gun for himself. In such circumstances, Abramski claims that a false response to Question 11.a. is not material. See Brief for Petitioner 28–30. Essentially, Abramski contends, when the hidden purchaser is eligible anyway to own a gun, all's well that ends well, and all should be forgiven.

But we think what we have already said shows the fallacy of that claim: Abramski's false statement was material because had he revealed that he was purchasing the gun on Alvarez's behalf, the sale could not have proceeded under the law—even though Alvarez turned out to be an eligible gun owner. The sale, as an initial matter,

would not have complied with §922(c)'s restrictions on absentee purchases. See *supra,* at 11–12. If the dealer here, Town Police Supply, had realized it was in fact selling a gun to Alvarez, it would have had to stop the transaction for failure to comply with those conditions. Yet more, the sale could not have gone forward because the dealer would have lacked the information needed to verify and record Alvarez's identity and check his background. See §§922(b)(5), (t)(1)(B)–(C); *supra,* at 10–12. Those requirements, as we have explained, pertain to the real buyer; and the after-the-fact discovery that Alvarez would have passed the background check cannot somehow wipe them away. Accordingly, had Town Police Supply known Abramski was a straw, it could not have certified, as Form 4473 demands, its belief that the transfer was "not unlawful." Supp. App. 3.

An analogy may help show the weakness of Abramski's argument. Suppose a would-be purchaser, Smith, lawfully could own a gun. But further suppose that, for reasons of his own, Smith uses an alias (let's say Jones) to make the purchase. Would anyone say "no harm, no foul," just because Smith is not in fact a prohibited person under §922(d)? We think not. Smith would in any event have made a false statement about who will own the gun, impeding the dealer's ability to carry out its legal responsibilities. So too here.

Abramski objects that because Alvarez could own a gun, the statute's core purpose—"keeping guns out of the hands" of criminals and other prohibited persons—"is not even implicated." Brief for Petitioner 29. But that argument (which would apply no less to the alias scenario) misunderstands the way the statute works. As earlier noted, the federal gun law makes the dealer "[t]he principal agent of federal enforcement." *Huddleston,* 415 U. S., at 824, see *supra,* at 16. It is that highly regulated, legally knowledgeable entity, possessing access to the expansive

NICS database, which has the responsibility to "[e]nsure that, in the course of sales or other dispositions . . . , weapons [are not] obtained by individuals whose possession of them would be contrary to the public interest." 415 U. S., at 825. Nothing could be less consonant with the statutory scheme than placing that inquiry in the hands of an unlicensed straw purchaser, who is unlikely to be familiar with federal firearms law and has no ability to use the database to check whether the true buyer may own a gun. And in any event, keeping firearms out of the hands of criminals is not §922's only goal: The statute's record-keeping provisions, as we have said, are also designed to aid law enforcement in the investigation of crime. See *supra,* at 2–3, 12–13. Abramski's proposed limitation on §922(a)(6) would undercut that purpose because many would-be criminals remain legally eligible to buy firearms, and thus could use straws to purchase an endless stream of guns off-the-books. See, *e.g., Polk*, 118 F. 3d, at 289 (eligible gun buyer used straw purchasers to secretly accumulate an "arsenal of weapons" for a "massive offensive" against the Federal Government).

In addition, Abramski briefly notes that until 1995, the ATF took the view that a straw purchaser's misrepresentation counted as material only if the true buyer could not legally possess a gun. See Brief for Petitioner 7–8; n. 8, *supra.* We may put aside that ATF has for almost two decades now taken the opposite position, after reflecting on both appellate case law and changes in the statute. See Tr. of Oral Arg. 41; Brady Handgun Violence Prevention Act of 1993, §103, 107 Stat. 1541 (codified at 18 U. S. C. §922(t)). The critical point is that criminal laws are for courts, not for the Government, to construe. See, *e.g., United States* v. *Apel*, 571 U. S. ___, (2014) (slip op., at 9) ("[W]e have never held that the Government's reading of a criminal statute is entitled to any deference"). We think ATF's old position no more relevant than its current one—

which is to say, not relevant at all. Whether the Government interprets a criminal statute too broadly (as it sometimes does) or too narrowly (as the ATF used to in construing §922(a)(6)), a court has an obligation to correct its error. Here, nothing suggests that Congress—the entity whose voice *does* matter—limited its prohibition of a straw purchaser's misrepresentation in the way Abramski proposes.

## IV

Finally, Abramski challenges his conviction under §924(a)(1)(A), which prohibits "knowingly mak[ing] any false statement . . . with respect to the information required by this chapter to be kept in the records" of a federally licensed dealer. That provision is broader than §922(a)(6) in one respect: It does not require that the false statement at issue be "material" in any way. At the same time, §924(a)(1)(A) includes an element absent from §922(a)(6): The false statement must relate to "information required by this chapter to be kept in [a dealer's] records." Abramski notes that the indictment in this case charged him with only one misrepresentation: his statement in response to Question 11.a. that he was buying the Glock on his own behalf rather than on someone else's. And, he argues, that information (unlike the transferee's "name, age, and place of residence," which he plausibly reads the indictment as not mentioning) was not required "*by this chapter*"—but only by Form 4473 itself—to be kept in the dealer's permanent records. Brief for Petitioner 32.

We disagree. Included in "this chapter"—Chapter 44 of Title 18—is a provision, noted earlier, requiring a dealer to "maintain such records of . . . sale, or other disposition of firearms at his place of business for such period, and in such form, as the Attorney General may by regulations prescribe." §923(g)(1)(A); *supra,* at 3. Because of that statutory section, the information that the Attorney General's regulations compel a dealer to keep is information

"required by this chapter."  And those regulations (the validity of which Abramski does not here contest) demand that every licensed dealer "retain . . . as a part of [its] required records, each Form 4473 obtained in the course of" selling or otherwise disposing of a firearm.  27 CFR §478.124(b).  Accordingly, a false answer on that form, such as the one Abramski made, pertains to information a dealer is statutorily required to maintain.[11]

## V

No piece of information is more important under federal firearms law than the identity of a gun's purchaser—the person who acquires a gun as a result of a transaction with a licensed dealer.  Had Abramski admitted that he was not that purchaser, but merely a straw—that he was asking the dealer to verify the identity of, and run a background check on, the wrong individual—the sale here could not have gone forward.  That makes Abramski's misrepresentation on Question 11.a. material under §922(a)(6).  And because that statement pertained to information that a dealer must keep in its permanent records under the firearms law, Abramski's answer to Question 11.a. also violated §924(a)(1)(A).  Accordingly, we affirm the judgment of the Fourth Circuit.

*It is so ordered.*

———————

[11] The dissent argues that our view would impose criminal liability for a false answer even to an "ultra vires question," such as "the buyer's favorite color."  *Post*, at 15.  We need not, and do not, opine on that hypothetical, because it is miles away from this case.  As we have explained, see *supra* at 9–19, Question 11.a. is not ultra vires, but instead fundamental to the lawfulness of a gun sale.  It is, indeed, part and parcel of the dealer's determination of the (true) buyer's "name, age, and place of residence," which §922(b)(5) requires the dealer to keep.  That section alone would justify Abramski's conviction under §924(a)(1)(A) if the indictment here had clearly alleged that, in addition to answering Question 11.a. falsely, he lied about that buyer's "name, age, and place of residence."

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–1493

_____

## BRUCE JAMES ABRAMSKI, JR., PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 16, 2014]

JUSTICE SCALIA, with whom THE CHIEF JUSTICE,
JUSTICE THOMAS, and JUSTICE ALITO join, dissenting.

Bruce Abramski bought a gun for his uncle from a fed-
erally licensed gun dealer, using money his uncle gave him
for that purpose. Both men were legally eligible to receive
and possess firearms, and Abramski transferred the gun
to his uncle at a federally licensed gun dealership in com-
pliance with state law. When buying the gun, Abramski
had to fill out Form 4473 issued by the Bureau of Alcohol,
Tobacco, Firearms, and Explosives (ATF). In response to a
question on the form, Abramski affirmed that he was the
"actual/transferee buyer" of the gun, even though the form
stated that he was not the "actual transferee/buyer" if he
was purchasing the gun for a third party at that person's
request and with funds provided by that person.

The Government charged Abramski with two federal
crimes under the Gun Control Act of 1968, as amended, 18
U. S. C. §§921–931: making a false statement "material to
the lawfulness of the sale," in violation of §922(a)(6), and
making a false statement "with respect to information
required by [the Act] to be kept" by the dealer, in violation
of §924(a)(1)(A). On both counts the Government inter-
prets this criminal statute to punish conduct that its plain
language simply does not reach. I respectfully dissent
from the Court's holding to the contrary.

## I. Section 922(a)(6)

### A

Under §922(a)(6), it is a crime to make a "false . . . statement" to a licensed gun dealer about a "fact material to the lawfulness of" a firearms sale. Abramski made a false statement when he claimed to be the gun's "actual transferee/buyer" as Form 4473 defined that term. But that false statement was not "material to the lawfulness of the sale" since the truth—that Abramski was buying the gun for his uncle with his uncle's money—would not have made the sale unlawful. See *Kungys* v. *United States*, 485 U. S. 759, 775 (1988) (plurality opinion) (materiality is determined by asking "what would have ensued from official knowledge of the misrepresented fact"); accord *id.,* at 787 (Stevens, J., concurring in judgment). Therefore, Abramski's conviction on this count cannot stand.

Several provisions of the Act limit the circumstances in which a licensed gun dealer may lawfully sell a firearm. Most prominently, the Act provides that no one may "sell or otherwise dispose of" a firearm to a person who he knows or has reasonable cause to believe falls within one of nine prohibited categories (such as felons, fugitives, illegal-drug users, and the mentally ill). §922(d). But the Government does not contend that either Abramski or his uncle fell into one of those prohibited categories. And no provision of the Act prohibits one person who is eligible to receive and possess firearms (*e.g.,* Abramski) from buying a gun for another person who is eligible to receive and possess firearms (*e.g.,* Abramski's uncle), even at the other's request and with the other's money.

The Government's contention that Abramski's false statement was material to the lawfulness of the sale depends on a strained interpretation of provisions that mention the "person" to whom a dealer "sell[s]" (or "transfer[s]," or "deliver[s]") a gun. A dealer may not "sell or

deliver" a firearm to a "person" without recording "the name, age, and place of residence of such person." §922(b)(5). He may not, without following special procedures, "sell" a firearm to a "person" who does not appear in person at the dealer's business. §922(c). He may not "transfer" a firearm to a "person" without verifying that person's identity and running a background check. §922(t)(1). And he may not "sell or deliver" a firearm to a "person" who he knows or has reasonable cause to believe resides in a different State. §922(b)(3).

The Government maintains that in this case *Abramski's uncle* was the "person" to whom the dealer "s[old]" the gun, and that the sale consequently violated those provisions. It bases that assertion on the claim that the Gun Control Act implicitly incorporates "principles of agency law." Brief for United States 17. Under those principles, it contends, the individual who walks into a dealer's store, fills out the requisite forms, pays the dealer, and takes possession of the gun is not necessarily the "person" to whom the dealer "sell[s]" the gun. Instead, it says, we must ask whether that individual bought the gun as a third party's common-law agent; if so, then the third party is the "person" to whom the dealer "sell[s]" the gun within the meaning of the relevant statutory provisions. The majority agrees: Although it never explicitly mentions agency law, it declares that if an individual is "buying a firearm on someone else's behalf," the "someone else" is the "person" to whom the dealer "sell[s]" the gun within the meaning of the statute. *Ante,* at 9.

I doubt that three of the four provisions at issue here would establish the materiality of Abramski's falsehood *even if* Abramski's uncle were deemed the "person" to whom the dealer "s[old]" the gun.[1] But §922(b)(3) would

---

[1]Sections 922(b)(5), (c), and (t)(1) require the dealer to follow certain procedures with respect to that "person," such as recording his name,

unquestionably do so, since it prohibits a dealer from
selling a gun to a person who resides in another State, as
Abramski's uncle did. That is of no moment, however,
because Abramski's uncle was not the "person" to whom
the gun was "s[old]."

The contrary interpretation provided by the Govern-
ment and the majority founders on the plain language of
the Act. We interpret criminal statutes, like other stat-
utes, in a manner consistent with ordinary English usage.
*Flores-Figueroa* v. *United States*, 556 U. S. 646, 650–652
(2009); *Jones* v. *United States*, 529 U. S. 848, 855 (2000);
*Bailey* v. *United States*, 516 U. S. 137, 144–145 (1995). In
ordinary usage, a vendor sells (or delivers, or transfers) an
item of merchandise to the person who physically appears
in his store, selects the item, pays for it, and takes posses-
sion of it. So if I give my son $10 and tell him to pick up
milk and eggs at the store, no English speaker would say
that the store "sells" the milk and eggs to me.[2] And even if
we were prepared to let "principles of agency law" trump
ordinary English usage in the interpretation of this crimi-
nal statute, those principles would not require a different

––––––––––

dealing with him in person, and checking his background. I doubt
whether a falsehood that causes the dealer to neglect those procedures
(here, by applying them to the wrong person) is *material to the lawful-
ness of the sale* within the meaning of §922(a)(6) if the sale could have
been executed lawfully had the truth been disclosed. Moreover, if that
were so—if a falsehood that introduced procedural error into a gun sale
were *always* material to lawfulness—then §924(a)(1)(A) (discussed in
Part II of this opinion), which prohibits making false statements with
respect to information required to be recorded in a dealer's records,
would be superfluous.

[2] The majority makes the puzzling suggestion that the answer would
be different if the sale involved consumer electronics instead of grocer-
ies. *Ante,* at 9, n. 5. But whether the item sold is a carton of milk, an
iPhone, or anything else under the sun, an ordinary English speaker
would say that an over-the-counter merchant "sells" the item to the
person who pays for and takes possession of it, not the individual to
whom that person later transfers the item.

result.  See, *e.g.,* Restatement (Second) of Agency §366, Illustration 1 (1957) ("On behalf of P, his disclosed principal, A makes a written contract with T wherein A promises to buy from T, *and T agrees to sell to A*, certain machinery for $1000. . . . [If there is fraud in the inducement and A has already paid], A can maintain an action against T for the thousand dollars" (emphasis added)).

*Huddleston* v. *United States*, 415 U. S. 814 (1974), on which the majority relies, *ante,* at 14, does not suggest otherwise.  There we addressed the *types* of transactions covered by the statutory term "acquisition" in §922(a)(6) (a term whose meaning is not at issue here), holding that they were not limited to "sale-like transaction[s]" but included a "pawnshop redemption of a firearm."  415 U. S., at 819.  We said nothing about the distinct question of *to whom* a dealer "sell[s]," "transfer[s]," or "deliver[s]" a firearm in a given transaction.  Nor does the case stand, as the majority believes, for "a substance-over-form approach," *ante,* at 14.  We said the term "acquisition" was "'aimed at providing maximum coverage,'" *ibid.* (quoting 415 U. S., at 826–827), not because substance over form demands that, nor because everything in the Act must be assumed to provide maximum coverage, but because "[t]he word 'acquire' is defined to mean simply 'to come into possession, control, or power of disposal of,'" which gives "no intimation . . . that title or ownership would be necessary."  *Id.,* at 820.

Contrary to the majority's assertion that the statute "merely raises, rather than answers, the critical question" of whether Abramski or his uncle was the "person" to whom the dealer "s[old]" the gun, *ante,* at 9, the statute speaks to that question directly.  Giving the text its plain, ordinary meaning, Abramski, not his uncle, was that "person."  That being so, the Government has identified no reason why the arrangement between Abramski and his uncle, both of whom were eligible to receive and possess

firearms, was "material to the lawfulness of" the sale.[3]

## B

The majority contends, however, that the Gun Control Act's "principal purpose" of "curb[ing] crime by keeping firearms out of the hands of those not legally entitled to possess them" demands the conclusion that Abramski's uncle was the "person" to whom the dealer "s[old]" the gun. *Ante,* at 11 (internal quotation marks omitted). But "no law pursues its purpose at all costs," and the "textual limitations upon a law's scope" are equally "a part of its 'purpose.'" *Rapanos* v. *United States*, 547 U. S. 715, 752 (2006) (plurality opinion). The majority's purpose-based arguments describe a statute Congress reasonably might have written, but not the statute it wrote.

The heart of the majority's argument is its claim that unless Abramski's uncle is deemed the "person" to whom the gun was "s[old]," the Act's identification, background-check, and record-keeping requirements would be "render[ed] meaningless." *Ante,* at 11. That vastly overstates the consequences. Perhaps the statute would serve the purpose of crime prevention *more effectively* if the requirements at issue looked past the "man at the counter" to the person "getting, and always meant to get, the fire-

---

[3]The facts of this case provide no occasion to address whether—as ATF maintained for many years before adopting its current position—a misrepresentation in response to Form 4473's "actual buyer/transferee" question would be "material to the lawfulness of the sale" if the customer intended to transfer the gun to a person who he knew or had reasonable cause to believe was prohibited by the Act from receiving or possessing firearms. A falsehood that conceals an intention of that sort may be material because a dealer who sold the gun knowing of that intention might be "unlawfully aiding" the customer's violation of §924(d) (and the prohibited person's violation of §924(g)). Cf. ATF, Industry Circular 79–10 (1979), in (Your Guide To) Federal Firearms Regulation 1988–89 (1988), p. 78; *infra*, at 10–11. I need not decide that question here.

arm." *Ante,* at 13.  But ensuring that the person taking
possession of the firearm from the dealer is eligible to
receive and possess a firearm, and recording information
about that person for later reference, are by no means
worthless functions.  On the contrary, they indisputably
advance the purpose of crime prevention by making it
harder for ineligible persons to acquire guns and easier for
the Government to locate those guns in the future; they
simply do not advance that purpose to the same degree as
a more exacting law might have done.

   That the Act's focus on the "man at the counter" in this
situation does not render its requirements "meaningless"
is confirmed by the Government's concession that the Act
has a similar focus in many comparable situations where
the gun's immediate purchaser is—to use the majority's
phrase—a "mere condui[t]" for a contemplated transfer of
the gun to a different person who will "take possession of,
own, and use" it.  *Ante,* at 11, 16.  Consider the following
scenarios in which even the Government regards the man
at the counter as the "person" to whom the dealer "sell[s]"
the gun:

- *Guns Intended as Gifts.*  In the Government's view,
  an individual who buys a gun "with the intent of
  making a gift of the firearm to another person" is
  the gun's "true purchaser."  ATF, Federal Firearms
  Regulations Reference Guide 165 (2005) (hereinaf-
  ter 2005 ATF Guide).  The Government's position
  makes no exception for situations where the gift is
  specifically requested by the recipient (as gifts
  sometimes are).  So long as no money changes
  hands, and no agency relationship is formed, be-
  tween gifter and giftee, the Act is concerned only
  with the man at the counter.

- *Guns Intended for Resale.*  Introducing money into

the equation does not automatically change the
outcome. The Government admits that the man at
the counter is the true purchaser even if he imme-
diately sells the gun to someone else. Tr. of Oral
Arg. 34–35. And it appears the Government's posi-
tion would be the same even if the man at the
counter purchased the gun with the *intent* to sell it
to a particular third party, so long as the two did
not enter into a common-law agency relationship.

- *Guns Intended as Raffle Prizes.* The Government
considers the man at the counter the true pur-
chaser even if he is buying the gun "for the purpose
of raffling [it] at an event"—in which case he can
provide his own information on Form 4473 and
"transfer the firearm to the raffle winner without a
Form 4473 being completed or a [background]
check being conducted" on the winner. 2005 ATF
Guide 195.

If the statute's requirements were "render[ed] meaning-
less" by treating Abramski rather than his uncle as the
true purchaser, then they would be every bit as meaning-
less in the scenarios just described. The Government's
concession that the statute is operating appropriately in
each of those scenarios should cause the majority to
reevaluate its assumptions about the type and degree of
regulation that the statute regards as "meaningful." The
majority, it is clear, regards Abramski's interpretation as
creating a loophole in the law; but even if that were a fair
characterization, why is the majority convinced that a
statute with so many *admitted* loopholes does not contain
this *particular* loophole?

The majority's answer to this argument is that "the
individual who sends a straw to a gun store to buy a fire-
arm is transacting with the dealer, in every way but the

most formal." *Ante,* at 16 (emphasis deleted).  That certainly distinguishes that individual from the intended subsequent donee or purchaser; so would the fact that he has orange hair.  But it does not establish why that individual, any more than the others, should be thought to be covered by statutory language (the "person" to whom a dealer "sell[s]" a gun) that does not naturally apply.  The only thing which can justify *that* leap is the false imperative to make the statute as effective as possible, rather than as effective as the language indicates Congress desired.[4]

What the scenarios described above show is that the statute typically *is* concerned only with the man at the counter, even where that man is in a practical sense a "conduit" who will promptly transfer the gun to someone else.  Perhaps that is because Congress wanted a rule that would be easy to understand and to administer, which the Government's proposed agency test—and the majority's apparent adoption of that test *sans* any mention of agency law—certainly is not.  (When counsel for the Government was pressed about hypothetical situations not gift-wrapped as neatly as this case, he said, frankly but unhelpfully, that they would turn on the "factual question" of "[w]hether the purchase was made on behalf of someone

––––––––––

[4]The majority's claim that its analysis "does not rest on mere 'purpose-based arguments,'" *ante,* at 9, n. 6, rings hollow.  The majority says it is relying on the principle that when a statutory provision is "ambiguous" but "only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law," we should adopt that meaning.  *Ibid.* (internal quotation marks omitted).  But even if the text at issue here were ambiguous, it is clear that the "substantive effect" of the narrower interpretation is "compatible with"—indeed, it is downright congenial to—"the rest of" the Gun Control Act.  The majority's contrary conclusion rests, not on anything in the text or structure of the Act, but on the majority's guess about how far Congress meant to go in pursuit of its crime-prevention "purpose."

else." Tr. of Oral Arg. 49–50.)

Or perhaps Congress drew the line where it did because the Gun Control Act, like many contentious pieces of legislation, was a "compromise" among "highly interested parties attempting to pull the provisions in different directions." *Barnhart* v. *Sigmon Coal Co.*, 534 U. S. 438, 461 (2002); see *Director, Office of Workers' Compensation Programs* v. *Newport News Shipbuilding & Dry Dock Co.*, 514 U. S. 122, 135–136 (1995). Perhaps those whose votes were needed for passage of the statute *wanted* a lawful purchaser to be able to use an agent. A statute shaped by political tradeoffs in a controversial area may appear "imperfect" from some perspectives, but "our ability to imagine ways of redesigning the statute to advance one of Congress' ends does not render it irrational." *Preseault* v. *ICC*, 494 U. S. 1, 19 (1990). We must accept that Congress, balancing the conflicting demands of a divided citizenry, "'wrote the statute it wrote'—meaning, a statute going so far and no further." *Michigan* v. *Bay Mills Indian Community*, 572 U. S. ___, ___ (2014) (slip op., at 11).

That Abramski's reading does not render the Act's requirements "meaningless" is further evidenced by the fact that, for decades, even ATF itself did not read the statute to criminalize conduct like Abramski's. After Congress passed the Act in 1968, ATF's initial position was that the Act did not prohibit the sale of a gun to an eligible buyer acting on behalf of a third party (even an ineligible one). See Hearings Before the Subcommittee To Investigate Juvenile Delinquency of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., pt. 1, 118 (1975). A few years later, ATF modified its position and asserted that the Act did not "prohibit a dealer from making a sale to a person who is actually purchasing the firearm for another person" *unless* the other person was "prohibited from receiving or possessing a firearm," in which case the dealer could be guilty of "unlawfully aiding the prohibited

person's own violation." ATF, Industry Circular 79–10 (1979), in (Your Guide To) Federal Firearms Regulation 1988–89 (1988), p. 78. The agency appears not to have adopted its current position until the early 1990's. See *United States* v. *Polk*, 118 F. 3d 286, 295, n. 7 (CA5 1997).

The majority deems this enforcement history "not relevant" because the Government's reading of a criminal statute is not entitled to deference. *Ante,* at 22. But the fact that the agency charged with enforcing the Act read it, over a period of roughly 25 years, not to apply to the type of conduct at issue here is powerful evidence that interpreting the Act in that way is natural and reasonable and does not make its requirements "meaningless."

### C

Even if the statute were wrongly thought to be ambiguous on this point, the rule of lenity would defeat the Government's construction. It is a "familiar principle" that "'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *Skilling* v. *United States*, 561 U. S. 358, 410 (2010). That principle prevents us from giving the words of a criminal statute "a meaning that is different from [their] ordinary, accepted meaning, and that disfavors the defendant." *Burrage* v. *United States*, 571 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 12). And it means that when a criminal statute has two possible readings, we do not "'choose the harsher alternative'" unless Congress has "'spoken in language that is clear and definite.'" *United States* v. *Bass*, 404 U. S. 336, 347–349 (1971). For the reasons given above, it cannot be said that the statute unambiguously commands the Government's current reading. It is especially contrary to sound practice to give this criminal statute a meaning that the Government itself rejected for years.

The majority does not mention the rule of lenity apart from a footnote, *ante*, at 18, n. 10, responding to this dis-

sent.  The footnote concedes that "the text creates some
ambiguity" but says that "context, structure, history, and
purpose resolve it."  *Ibid.*  But for the reasons given above,
context and structure do not support the majority's inter-
pretation, history refutes it by showing that the Govern-
ment itself interpreted the statute more leniently for
many years, and "purpose" supports it only if one imputes
to the statute a crime-fighting purpose broader than the
text discloses (a practice that would nullify the rule of
lenity in all cases).  See Part I–B, *supra.*[5]  If lenity has no
role to play in a clear case such as this one, we ought to
stop pretending it is a genuine part of our jurisprudence.

Contrary to the majority's miserly approach, the rule of
lenity applies whenever, after all legitimate tools of inter-
pretation have been exhausted, "a reasonable doubt per-
sists" regarding whether Congress has made the defend-
ant's conduct a federal crime, *Moskal* v. *United States*, 498
U. S. 103, 108 (1990)—in other words, whenever those
tools do not decisively dispel the statute's ambiguity.
*Skilling*, *supra,* at 410; see, *e.g., Scheidler* v. *National
Organization for Women, Inc.*, 537 U. S. 393, 409 (2003);
*Cleveland* v. *United States*, 531 U. S. 12, 25 (2000); *Cran-
don* v. *United States*, 494 U. S. 152, 158 (1990).  "[W]here
text, structure, and history fail to establish that the Gov-
ernment's position is unambiguously correct . . . we apply
the rule of lenity and resolve the ambiguity in [the de-
fendant]'s favor."  *United States* v. *Granderson*, 511 U. S.
39, 54 (1994).  It cannot honestly be said that the text,
structure, and history of the Gun Control Act establish as
"unambiguously correct" that the Act makes Abramski's
conduct a federal crime.

By refusing to apply lenity here, the majority turns its

---

[5]The majority is thus entirely wrong to charge that I would apply the
rule of lenity "because the statute's text, taken alone, permits a nar-
rower construction," *ante,* at 18, n. 10.

back on a liberty-protecting and democracy-promoting rule that is "perhaps not much less old than construction itself." *United States* v. *Wiltberger*, 5 Wheat. 76, 95 (1820) (Marshall, C. J.); see, *e.g.,* 1 W. Blackstone, Commentaries on the Laws of England 88 (1765) ("Penal statutes must be construed strictly"). As Chief Justice Marshall wrote, the rule is "founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department." *Wiltberger, supra,* at 95. It forbids a court to criminalize an act simply because the court deems that act "of equal atrocity, or of kindred character, with those which are enumerated." *Id.,* at 96. Today's majority disregards that foundational principle.

## II. Section 924(a)(1)(A)

Under §924(a)(1)(A), it is a crime to make a "false statement . . . with respect to the information *required by this chapter* to be kept in the records of" a federally licensed gun dealer (emphasis added). "[T]his chapter" refers to chapter 44 of title 18 of the United States Code, which contains the Gun Control Act. §§921–931.

The question Abramski answered falsely was whether he was buying the gun for someone else. Did the Act itself require the dealer to record this information? It did not; it simply required him to record "the name, age, and place of residence" of the "person" to whom the firearm was "s[old] or deliver[ed]." §922(b)(5). As explained above, that "person" was Abramski, not his uncle. See Part I, *supra*.

But, the majority says, the Act also directs dealers to "'maintain such records . . . as the Attorney General may by regulations prescribe.'" *Ante,* at 22 (quoting §923(g)(1)(A)). So did a regulation require this information to be recorded? Again, no. The relevant regulation provides that a dealer shall

"obtain a Form 4473 from the transferee showing the

transferee's name, sex, residence address (including
county or similar political subdivision), date and place
of birth; height, weight and race of the transferee; the
transferee's country of citizenship; the transferee's
INS-issued alien number or admission number; the
transferee's State of residence; and certification by the
transferee that the transferee is not prohibited by the
Act from transporting or shipping a firearm in inter-
state or foreign commerce or receiving a firearm
which has been shipped or transported in interstate or
foreign commerce or possessing a firearm in or affect-
ing commerce." 27 CFR §478.124(c)(1) (2014).

The long list of information that this regulation requires
to be kept in the dealer's records does not include whether
the transferee is buying the gun for an eligible third party.

But wait! the majority says: Another provision of the
regulation requires a dealer to "'retain . . . as part of [its]
required records, each Form 4473 obtained in the course
of'" selling or disposing of a firearm. *Ante,* at 23 (quoting
27 CFR §478.124(a)). Therefore, according to the majority,
any "false answer on that Form"—even an answer to a
question that is not among those enumerated in the regu-
lation—necessarily "pertains to information a dealer is
statutorily required to maintain." *Ante,* at 23.

That carries the text of the statute a bridge too far. On
the majority's view, if the bureaucrats responsible for
creating Form 4473 decided to ask about the buyer's favor-
ite color, a false response would be a federal crime. That
is not what the statute says. The statute punishes mis-
statements "with respect to *information* required to be
kept," §924(a)(1)(A) (emphasis added), not with respect to
"information contained in forms required to be kept."
Because neither the Act nor any regulation requires a
dealer to keep a record of whether a customer is purchas-
ing a gun for himself or for an eligible third party, that

question had no place on Form 4473—any more than
would the question whether the customer was purchasing
the gun as a gift for a particular individual and, if so, who
that individual was.  And the statute no more criminalizes
a false answer to an ultra vires question on Form 4473
than it criminalizes the purchaser's volunteering of a false
e-mail address on that form.  Information regarding
Abramski's status as a "straw purchaser" was not "infor-
mation required to be kept," and that is an end of the
matter.  In my view, that is the best—indeed, the only
plausible—interpretation of §924(a)(1)(A).  But at a mini-
mum, the statute is ambiguous, and lenity does the rest.
See Part I–C, *supra*.[6]

\*     \*     \*

The Court makes it a federal crime for one lawful gun
owner to buy a gun for another lawful gun owner.  Whether
or not that is a sensible result, the statutes Congress
enacted do not support it—especially when, as is appro-
priate, we resolve ambiguity in those statutes in favor of
the accused.  I respectfully dissent.

———————

[6] The majority professes that it "need not, and do[es] not, opine on"
whether it would impose liability for "a false answer even to an 'ultra
vires question'" because, given its reasoning on Count One, the ques-
tion at issue here was "part and parcel of the dealer's determination of
the (true) buyer's 'name, age, and place of residence,' which §922(b)(5)
requires the dealer to keep."  *Ante,* at 23, n. 11.  But if that is really all
the majority means to decide, then why bother to invoke the require-
ment that the dealer keep such records as the regulations prescribe and
the regulation requiring the dealer to keep Form 4473?  See *ante,* at
22–23.  If the majority's ruling is as limited as it claims, it ought to cite
§922(b)(5) and be done.